**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | )    **Case No. 1:17-cr-00089 (EGS)** |
| | ) |
| **CLARK CALLOWAY, JR.** | ) |
| | ) |
| **Defendant.** | ) |

———————————————————————

**DETENTION MEMORANDUM**

This matter comes before the Court upon the application of the United States that Defendant, Clark Calloway, be detained pending trial.  Defendant has been charged by Indictment with: one count of interstate transport of a firearm and ammunition with the intent to commit a felony, in violation of 18 U.S.C. § 924(b); one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g);[1] and one count of possession of a machine gun, in violation of 18 U.S.C. § 922(o).  The Court held a detention hearing on May 10, 2017.

Upon consideration of the proffers and arguments of counsel and the entire record herein, the Court ordered Defendant held without bail pursuant to 18 U.S.C. § 3142(e).  This memorandum is submitted in compliance with the statutory obligation that "the judicial officer shall . . . include written findings of fact and a written statement of the reasons for the detention."  18 U.S.C. § 3142(i)(1).  The findings of fact and statements of reasons in support of the Order of Detention follow.

**FINDINGS OF FACT**

At the detention hearing, the United States proceeded by proffer based on the Indictment.

---

[1] Defendant's underlying felony conviction is for aggravated assault in 2002, in violation of D.C. Code § 22-404.01.  The maximum term of imprisonment for that offense is ten years.  D.C. Code § 22-404.01(b).

The defense offered no contrary evidence.  Accordingly, the Court makes the following findings of fact regarding the government's investigation.

While Defendant's charges involve his unlawful possession of a firearm, the government's investigation into Defendant's conduct stems from his activity on the social-networking website Facebook.  The FBI began investigating Defendant in June 2016 after an FBI agent acting in an undercover capacity found Defendant's public Facebook account created in his name—"Clark Calloway"—and noticed that he had posted images associated with jihadism and terrorism, including pictures of individuals carrying weapons and a black flag commonly associated with the Islamic State of Iraq and al Sham ("ISIS"), a Foreign Terrorist Organization.[2]  The investigation revealed that Defendant's Facebook posts regarding jihadism and terrorism date back to May 2013 and span multiple Facebook accounts.  In addition to the "Clark Calloway" Facebook account, which was created by Defendant using his e-mail address and pictures of him, the FBI uncovered two additional Facebook accounts—one under the name "Alexander Dumas," and another under the name "Clark Calloway Jr."—created by Defendant using his e-mail addresses and pictures of himself.  In the past, Facebook has shut down Defendant's accounts for violating Facebook's terms and conditions of use.

Defendant maintains multiple active Facebook accounts to express various extremist-racial and pro-ISIS sentiments.  On Defendant's "Clark Calloway" Facebook account, for example, Defendant made a number of posts pledging his support to Abu Bakr al-Baghdadi, the leader of ISIS, and expressing his desire to establish an Islamic Caliphate as declared by ISIS.  He used this account to urge others to engage in mass violence and noted that his "weapons of choice" were knives

---

[2] ISIS is an alias for the Islamic State of Iraq and the Levant ("ISIL"), which the Secretary of State designated as a Foreign Terrorist Organization in 2014.

and machetes based on his belief that machetes were efficiently used to kill unarmed victims during the Rwandan genocide.  He also expressed a desire to stage a race war against white Americans and boasted that he knows "how to make explosives" from his time serving in the United States Marine Corps.  On his "Alexander Dumas" Facebook account, Defendant "friended" hundreds of individuals assessed by the FBI to be ISIS fighters and sympathizers, joined a number of ISIS-related Facebook groups, and posted pro-ISIS statements.

One of the individuals Defendant "friended" using the "Alexander Dumas" Facebook account is a confidential informant ("CHS1") who has been providing reliable information to the FBI in other investigations for the past four years.  Since the beginning of their friendship in September 2016, CHS1 has taken screenshots of CHS1's online conversations with Defendant for the FBI.  In these conversations, Defendant shared his hatred for white people, his belief in extremist Islamic ideology, and his interest in conducting a violent jihad.  He has described himself to CHS1 as a "Mujahid," or one engaged in a holy war, and indicated to CHS1 that he believes the FBI is watching him.[3]  Defendant also expressed support for various terrorist attacks and claimed to have befriended while incarcerated in federal prison an individual who conspired to murder United States military personnel in 2007.  In one conversation with CHS1, Defendant expressed his intent to "kill some of these crackers before the death angel approaches" in an effort to overthrow the U.S. government.

In November 2016, the FBI approached and began working with a second confidential informant ("CHS2"), who has known Defendant since 2015.[4]  Prior to any contact with the FBI,

---

[3] FBI agents interviewed Defendant at his place of employment in October 2015.

[4] CHS2 is seeking lawful permanent residence in the United States but has a checkered history with the Department of Homeland Security.  CHS2 has been convicted of multiple felonies, including a drug-trafficking offense in the early 1990s that CHS2 failed to disclose to the Department of Homeland Security.  CHS2 similarly failed to disclose a

CHS2 sent Defendant a photograph of CHS2 holding an AK-47 machine gun. Defendant expressed an interest in purchasing the gun, but CHS2 declined to sell it to him. Defendant informed CHS2 that if he had that firearm, he "would start a revolutionary war." In December 2016, at the FBI's request, CHS2 agreed to offer to sell Defendant another firearm similar to the gun in CHS2's photograph. CHS2 sent Defendant a new picture of CHS2 holding an M-16 rifle—a fully automatic machine gun—and offered to sell it to Defendant. Defendant then called CHS2 and indicated that he was interested in purchasing the weapon but could not afford it. Several months later, in February 2017, CHS2 sent Defendant a picture of CHS2 holding two assault rifles, one of which was an AK-47, with the caption "Jihad, salam alaikum. Name your $$$. Hit me up soon." Defendant asked CHS2 if CHS2 had ammunition for the AK-47 and expressed an interest in the gun, but later admitted that he could not afford it. A few months later, on April 12, 2017, CHS2 and Defendant met in person, and CHS2 claims that Defendant made multiple statements regarding his dislike for America, the American government, and white people. CHS2 claims that CHS2 then asked Defendant what he would do if he had a gun, and Defendant replied that he did not want a gun because he did not have the "heart for that."

During this time, the FBI was simultaneously working with a third confidential informant ("CHS3") in its investigation.[5] CHS3 and Defendant shared text messages throughout the beginning of 2017 in which Defendant expressed his hatred for non-Muslims. In March 2017, CHS3 informed Defendant that CHS3 was bringing CHS3's brother two M-16 rifle magazines. After Defendant explained that he used an M-16 rifle while in the Marine Corps, CHS3 told Defendant

_____

change in CHS2's travel documents as required by the Department of Homeland Security. In exchange for working with the FBI, CHS2 received less than $300.

[5] CHS3 does not live in the District of Columbia and has reliably worked with law enforcement on a number of successful investigations since 2003. Prior to CHS3's involvement with the FBI, CHS3 was convicted of two felonies.

that guns are widely available in CHS3's state.  The two met on March 31, 2017, at which point

CHS3 told Defendant that CHS3 had weapons and could get an additional weapon for $200.  De-

fendant told CHS3 that he wanted one, later explaining that he wanted an AK-47 specifically after

seeing one in a television documentary about ISIS the two watched together.  CHS3 told Defendant

that CHS3 could get Defendant a fully-automatic AK-47 for $250 or an older, semi-automatic AK-

47 for $200.  The two then devised a plan where CHS3 would get Defendant a semi-automatic

AK-47 in exchange for two $100 payments.

Shortly after, CHS3 sent Defendant a text message offering to sell Defendant a fully auto-

matic AK-47 for $250 instead of the cheaper semi-automatic rifle, and Defendant agreed to that

deal.  On April 7, 2017 Defendant met with CHS3 and told CHS3 that he would give CHS3 $60

as an initial payment for the AK-47.  Defendant than gave CHS3 the money and confirmed that he

would pay the additional $190 at a later date.  The two met again a week later and CHS3 showed

Defendant a picture of the AK-47 CHS3 agreed to sell him.  Defendant appeared excited and told

CHS3 that he would use the rifle to conduct a coordinated assault similar to the tactics used by the

Viet Cong.  Defendant explained that he would organize "four man units all over the country" to

kill police officers, and told CHS3 that he could make explosives if he had the proper equipment.

On April 28, 2017, Defendant and CHS3 met in the District of Columbia and Defendant

provided CHS3 with the remaining $190 for the AK-47.  Defendant reiterated that he wanted the

gun "to be ready to do something here," including possibly attacking the Washington, D.C. police

department.  Defendant made similar suggestions and threats of violence around this time on his

"Alexander Dumas" Facebook account.  For example, on March 31, 2017, the day Defendant

agreed to purchase an AK-47 from CHS3, Defendant posted that he "had a good visit with [his]

Muslim neighbor" and explained that "[t]his is trouble for the nonbelievers."  Later, he posted

about "executing" people using an AK-47, and noted that his "[w]eapon[s] of choice" include a machete and an AK-47.  He also expressed an interest in "kill[ing] with impunity" and made multiple references to imminent racial and religious violence.  After Defendant made the $60 down payment on CHS3's AK-47, Defendant posted that "war is imminent," and that he has "prepared all of [his] life" for it.  He posted that an AK-47 was "in route," that his machete was "on deck," and that he was going to go on a "killing/cannibal spree[.]"  He specifically expressed an intent to target military and combat veterans and posted multiple images, including a picture of fighters carrying AK-47 rifles, associated with ISIS on his Facebook account.  On April 30, 2017, Defendant made the following post: "Ak- 47!  Remember this post."

CHS3 received a fully automatic AK-47 rifle with ammunition on May 4, 2017.  That same day, FBI agents disabled the firearm and travelled with CHS3 into the District of Columbia.  CHS3 then informed Defendant that he could come over to CHS3's apartment in the District.  When Defendant arrived, CHS3 provided him with the AK-47, at which point Defendant was arrested in the apartment while in possession of the machine gun.  Law enforcement later found a machete in Defendant's apartment.

After his arrest, Defendant waived his *Miranda* rights and acknowledged that he paid CHS3 $250 for the AK-47 found in his possession.  He initially claimed that the gun was for protection in his neighborhood, but later explained that he wanted to have it for "a rainy day."  He acknowledged that he could not possess a firearm due to his criminal history and eventually stated that he needed it for a race war.  He further explained that he bought the gun voluntarily and admitted to owning and controlling the "Clark Calloway" and "Alexander Dumas" Facebook accounts.  He also admitted to making a number of the Facebook posts on those accounts referenced in the government's proffer and discussing attacks on police stations, but denied ever expressing

6

an intent to target a specific police station.

## DISCUSSION

### A.    Legal Standard

The Bail Reform Act of 1984, 18 U.S.C. § 3142 *et seq.*, provides, in pertinent part, that if a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e). Thus, even absent a flight risk, danger to the community alone is sufficient reason to order pretrial detention. *United States v. Salerno*, 489 U.S. 739, 755 (1987); *United States v. Perry*, 788 F.2d 100, 113 (3d Cir. 1986); *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986). Where the judicial officer's justification for detention is premised upon the safety of the community, the decision must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f). Where the justification for detention is the judicial officer's finding that no set of conditions will assure the defendant's appearance in court, such a decision must be supported by a preponderance of the evidence. *See United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).

### B.    The Four Factors of Section 3142(g)

In determining whether there are conditions of release that will reasonably assure the safety of any other person and the community and the appearance of the defendant as required, the judicial officer considers: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

### 1.   *Nature and Circumstances of the Charged Offense*

The first factor, the nature and circumstances of the charged offense, weighs in favor of detention.  This factor asks the Court to consider "the nature and circumstances of the offense charged" as a general matter, but points especially to instances where "the offense is a crime of violence, a violation of Section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device."  *Id.* § 3142(g)(1).

The Court recognizes that the possession of firearms by felons continues to represent a significant and dangerous problem in the District of Columbia.  This is particularly true in Defendant's case, where the firearm in question is a loaded, fully-automatic machine gun and Defendant's previous convictions include, among others, one count of aggravated assault and one count of carrying a dangerous weapon.  Reflecting the seriousness of the offenses charged in the Indictment, Defendant faces a combined thirty years in prison if found guilty of all three.

Further, the government has established probable cause here to believe that Defendant intended to commit a felony—specifically, assault with a dangerous weapon—with the AK-47.  As the above findings of fact demonstrate, Defendant expressed animus towards many groups of people, including white Americans, law enforcement officials, and non-Muslims.  He publicly posted these views online and made numerous calls for violence against others.  He sought to purchase an AK-47 machine gun from two separate individuals and posted a series of statements online once he arranged for the purchase of an AK-47 that contained threats of violence specifically involving that type of firearm.

### 2.   *The Weight of the Evidence*

The Court finds that the weight of the evidence also favors detention.  Defendant points out that the government's proffer relies on paid-for information provided by two convicted felons

and that Defendant's Facebook activity alone is insufficient to prove that he is an ISIS sympathizer. These arguments, however, do little to combat the evidence presented by the government.  Indeed, with respect to the possessory offenses, the government has made a strong showing that Defendant was in possession of a fully-automatic AK-47 machine gun and that he is a convicted felon.  It is undisputed that, in 2002, Defendant was convicted of felony aggravated assault, in violation of D.C. Code § 22-404.01, after he stabbed someone multiple times in Washington, D.C.  Further, at the detention hearing in this matter, counsel for the government indicated that they had multiple witnesses and video or photographic proof of Defendant's possession of the firearm.  On top of this, the government's proffer contains information gleaned from statements from three confidential informants, postings Defendant himself made online, and Defendant's own post-arrest statements to law enforcement confirming that Defendant sought out an AK-47 machine gun, arranged for its interstate travel and purchase, and intended to use it in furtherance of race- or religion-based violence.

### 3.    *The History and Characteristics of the Defendant*

This factor also supports detention.  Section 3142 directs the Court to consider:  (1) the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (2) whether, at the time of the current offense or arrest, the defendant was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law.  18 U.S.C. § 3142(g)(3)(A)–(B).

The Court recognizes that Defendant has some contacts to the community.  At a minimum, he maintains employment as a construction worker in the District and lives in the area.  Based on

9

these contacts, the Court is satisfied that there exists a set of conditions of release that will assure Defendant's future appearance.  Nevertheless, the Court is unable to ignore Defendant's history of violence and, importantly, noncompliance with past supervised release.  In 2002, for example, Defendant was charged with assault with intent to kill while armed after stabbing an individual multiple times in the chest, lower back, legs, and arms.  He later pleaded guilty to aggravated assault and misdemeanor carrying a weapon for that conduct.  His supervised release related to that conviction was then revoked after he was charged with sexual solicitation in 2006.  Shortly after, according to the government's proffer, Defendant was arrested again for carrying a dangerous weapon but was never convicted.  In 2011, Defendant was charged with assaulting his now ex-wife.  He entered into a deferred sentencing agreement, in which he agreed to avoid any re-arrests, stay away from his ex-wife, receive drug treatment, and complete a domestic violence intervention program.  Not long after entering into that agreement, however, he was arrested again for violating the stay-away order relating to his ex-wife and was found in possession of a knife. He also failed to complete his required community service hours and tested positive for the use of marijuana.  Accordingly, in 2012, his deferred sentencing agreement was revoked and he was sentenced and convicted.

Based on these facts, the Court has no confidence that Defendant would not re-offend or comply with the terms of his supervision even were he to be released into the High Intensity Supervision Program.

### 4.    The Danger to the Community

The fourth factor, the danger to the community posed by Defendant, weighs in favor of detention as well.  The Court is cognizant of the danger posed to the community by the possession of firearms by felons, particularly by felons who, like Defendant, have a history of violent criminal

conduct.  The facts specific to Defendant's case, however, give the Court even greater cause for concern than is typical with such an offense.  Indeed, Defendant was not arrested in possession of a handgun, but a fully-automatic AK-47 machine gun.  He made repeated statements online and in person that he intended to use that machine gun to commit acts of violence against other individuals, including murder.  Moreover, these repeated statements evince an intent on Defendant's part to use that machine gun to target specific groups of people—non-Muslims and white Americans— towards whom he had expressed extreme animus.  Given the steps Defendant took to purchase the AK-47 and the statements he posted online during that process, the Court cannot conclude that Defendant's comments were idle threats.  Rather, they appear to be part of a plan by Defendant thwarted by law enforcement to harm those with whom he disagrees.  For these reasons, the Court believes that there is no condition or combination of conditions that would reasonably assure the safety of the community if Defendant were released.

## CONCLUSION

Based on the consideration of all the evidence and the factors set forth in Section 3142(g) and all lesser restrictive alternatives to pretrial detention, the Court finds by clear and convincing evidence that no condition or combination of conditions exist that would reasonably assure the safety of any other person or of the community if Defendant were released.  Therefore, the government's motion for pretrial detention is granted.

Date:  May 12, 2017

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

11